**KAZEROUNI LAW GROUP, APC**
Yana A. Hart (SBN: 306499)
yana@kazlg.com
2221 Camino Del Rio South, Suite 101
San Diego, California 92108
Telephone: 619.233.7770
Fax: 619.297.1022

Attorney for Plaintiff
DEBORAH PEREZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH PEREZ,<br><br>             Plaintiff,<br><br>      v.<br><br>PACE FUNDING GROUP, LLC;<br>RENEW FINANCIAL, LLC; RENEW<br>FINANCIAL GROUP, LLC; and<br>RENEW FINANCIAL HOLDINGS,<br>INC.,<br><br>             Defendants. | Case No. 4:20-cv-04132<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF:**<br><br>(1) **THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601 ET SEQ.;**<br>(2) **THE HOME OWNERSHIP EQUITY PROTECTION ACT, 15 U.S.C. § 1639;**<br>(3) **THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, CAL. CIV. CODE § 1788 ET SEQ.;**<br>(4) **CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750 ET SEQ.;**<br>(5) **CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200;**<br>(6) **FRAUD; AND**<br>(7) **DEPENDENT ADULT FINANCIAL ABUSE, CAL. WIC § 15610 ET SEQ.**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      Deborah Perez ("Mrs. Perez" or "Plaintiff") brings this Complaint against PACE Funding Group, LLC ("PFG"); Renew Financial, LLC; Renew Financial Group, LLC ("Renew"); and Renew Financial Holdings, Inc. ("Holdings")[1]; (collectively, "Defendants") for violations of: (1) the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"); (2) the Home Ownership Equity Protection Act, 15 U.S.C. § 1639 ("HOEPA"); (3) the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 et seq. (the "Rosenthal Act"); (4) Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq. ("CLRA"); (5) California's Unfair Competition Law, Cal. Bus. and Prof. Code § 17200 ("UCL"); (6) Fraud; and (7) Dependent Adult Financial Abuse, Cal WIC § 15610 et seq.

2.      Through its Streets and Highways Code,[2] the State of California has authorized property owners to enter into voluntary contractual assessments with pre-approved organizations to finance the installation of permanent, clean-energy or energy-efficient improvements on real property.

3.      This energy-efficient home improvement financing is called Property Assessed Clean Energy ("PACE") financing.

4.      PACE financing programs gained popularity during the Obama administration. First started in 2008, municipal governments established PACE financing districts to allow homeowners to repay privately financed loans through a special tax assessment on their property tax bills. PACE loans in California cover items such as solar panels, low-flow toilets that save water, or in this case, "drought-resistant landscaping" and various "green" window replacements.

---

[1] Plaintiff and U.S. Green Builders, Inc. ("Builders") agreed to and filed a stipulation on August 19, 2020 (Dkt. 13) to arbitrate the matter between them. Accordingly, references to Builders are only for the purpose of explaining Plaintiff's allegations against PFG.
[2] Cal. Sts. & High Code § 5898.10 et seq. authorizes legislative bodies to approve Property Assessed Clean Energy Programs.

5.     Defendants in the instant action use California's PACE legislation to defraud California homeowners and acquire first-priority tax liens on real property.

6.     Defendants PFG and Renew/Holdings are pre-approved PACE financing organization purporting to finance homeowners for clean energy or energy-efficient home improvements.

7.     PFG and Renew/Holdings provide a platform and use contractors to solicit loans and complete home improvement services. Indeed, PACE programs are designed to use home improvement contractors as the salespeople for the loan product. Marketing for eligible upgrades is typically done by contractors through door-to-door salespersons, up-selling from other repairs, advertisements and telemarketers.

8.     Without properly screening and monitoring its network of contractors and encouraging predatory lending and aggressive marketing, contractors who serve as de-facto mortgage brokers too often misrepresent how the financing works, sticking people with loans they can neither understand nor afford.

9.     In fact, contractors serve as a homeowner's "primary" source of information about the loans. Neither PFG nor Renew/Holdings tells its contractors they need to determine if customers can afford the loan, and PFG and Renew/Holdings simply rubber-stamp payments to contractors, without regard to whether the contractors followed applicable guidelines and laws.

10.     Unlike traditional home improvement financing, PACE financing creates a loan in the form of a voluntary special assessment or special property tax. Homeowners must pay these special assessments when paying their property taxes to the county tax collector. The money collected is then disbursed back to the pre-approved creditor who originally lent the money to homeowners.

11.     Assessments resulting from PACE financing ("PACE Assessments") attach to homeowners' properties as a tax lien, which are prioritized over other debts, like mortgages, on the property.

12.     As a priority tax lien, PACE Assessments inhibit the marketability of real property, prohibiting potential buyers from securing purchase money from mortgage industry participants, such as the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation.

13.     Through this financing program, PFG can obtain priority over all existing mortgages and lien-holders on a homeowner's property.

14.     Further, because PACE financing is a tax assessment, PFG is able to shift the burden of collecting payments to the county tax assessor.

15.     Borrowers then become at risk of losing their homes because the loans place liens on their houses, lack adequate consumer protections, and are marketed and sold by unscrupulous or self-serving contractors who are not properly monitored.[3]

16.     When soliciting to homeowners, PFG and its contractors do not adhere to requisite consumer protection disclosures and procedures.

17.     Because Defendants bear little risk, they specifically defraud vulnerable, low-income homeowners, such as disabled and elderly individuals, who will sign PACE Assessment contracts without knowing the true cost of their home improvements.

18.     Defendants use the guise of "tax assessments" to gain home improvement mortgage liens and believe this semantic ruse allows them to skirt restrictions set by consumer protection laws, such as the Truth in Lending Act and Home Ownership Equity Protection Act.

19.     Indeed, throughout the history of PACE funding, programs like Defendants' have distributed unaffordable home loans to low-income homeowners who have fixed incomes and little ability to pay.

///

///

---

[3] https://www.latimes.com/business/la-fi-pace-loans-20170604-story.html (Last visited 06/10/20).

20.   Because the PACE funding creditors obtain a priority lien on the consumer's home, one which puts itself ahead of other mortgage holders, PACE lenders have an incentive to make home-secured loans that are likely to default.

21.   Specifically, Defendants have consistently targeted and solicited to senior or disabled homeowners, seeking to take advantage of their vulnerability, susceptibility to persuasion, susceptibility to pressuring sales tactics, and inability to comprehend or even review the documents provided in electronic versions.

22.   Recent legislation has developed to combat and prevent future exploitation of consumers. In 2017, California Governor Jerry Brown signed two bills to better ensure consumer protections for borrowers taking out PACE loans. The bills became effective in 2018. These bills enshrine a number of reforms into law, including a first-time requirement that a borrower's income be factored into underwriting. The legislation also bars kickbacks and establishes a minimum training requirement for contractors, who typically act as salespeople.

23.   Plaintiff, through her attorneys, brings this action to challenge the conduct of Defendants in response to Defendants' fraudulent and abusive conduct in coercing her to sign up for PACE-financed renovations.

24.   Plaintiff makes these allegations on information and belief, except allegations that pertain to Plaintiff, which she alleges on personal knowledge.

25.   While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

26.   Unless otherwise stated, all of Defendants' conduct occurred within California.

27.   All of Defendants' violations were knowing, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid these violations.

///

///

///

1

## JURISDICTION & VENUE

2       28.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

3 This Court has supplemental jurisdiction for Plaintiff's state claims pursuant to 28

4 U.S.C. § 1367.

5       29.    This Court has personal jurisdiction over PFG because it is a California

6 company that at all times relevant regularly conducted business in the State of

7 California.

8       30.    This Court has personal jurisdiction over Renew because it is a Delaware

9 company that at all times relevant regularly conducted business in the State of

10 California.

11       31.    This Court has personal jurisdiction over Holdings because it is a

12 Delaware company that at all times relevant regularly conducted business in the State

13 of California.

14       32.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants, at

15 all times herein mentioned, were doing business in the County of Contra Costa, State

16 of California. Further, venue is proper in this district because Plaintiff resided in this

17 district at all times herein mentioned such that a substantial part of the events giving

18 rise to the claims occurred in this district.

19 ## PARTIES & DEFINITIONS

20       33.    Plaintiff is a natural person and disabled citizen residing in the County

21 of Contra Costa, State of California.

22       34.    Plaintiff has Multiple Sclerosis ("MS") and qualifies for permanent

23 disability. Plaintiff's MS interferes with several normal daily activities, and she is

24 therefore a "dependent adult" as defined in Cal WIC § 15610.23.

25       35.    Plaintiff was involved in a transaction with a party offering or extending

26 credit with the purpose of home improvement. Plaintiff is therefore a "consumer"

27 under 15 U.S.C. § 1602(i) and a "debtor" under Cal. Civ. Code § 1788.2(h).

28 ///

36.   PFG is a California limited liability company, headquartered in Los Gatos, California. Through its PACE financing program, PFG, in connection with services, regularly extends consumer credit which is payable through an agreement in more than four installments for which a finance charge is imposed. Therefore, PFG is a "creditor" under 15 U.S.C. § 1602(g).

37.   PFG also charges interest rates for providing PACE financing services and collects them through consumer tax payments. Therefore PFG, in the ordinary course of business, regularly, on behalf of itself, or others, engages in debt collection as that term is defined by California Civil Code § 1788.2(b), and is therefore a debt collector as defined in California Civil Code § 1788.2(c) and a "person" as defined by Cal. Civ. Code § 1788.2(g).

38.   Holdings is a Delaware corporation headquartered in Oakland, California. It is also Renew's holding company.

39.   Renew is a Delaware corporation, headquartered in Oakland, California. Through its PACE financing program, Renew, in connection with services, regularly extends consumer credit which is payable through an agreement in more than four installments for which a finance charge is imposed. Therefore, Renew is a "creditor" under 15 U.S.C. § 1602(g).

40.   Renew also charges interest rates for providing PACE financing services and collects them through consumer tax payments. Therefore Renew, in the ordinary course of business, regularly, on behalf of itself or others, engages in debt collection as that term is defined by California Civil Code § 1788.2(b), and is therefore a debt collector as defined in California Civil Code § 1788.2(c) and a "person" as defined by Cal. Civ. Code § 1788.2(g)

41.   This matter involves a "consumer credit transaction" i.e., a transaction between Plaintiff and Defendants, in which property or money was acquired on credit primarily for personal, family, or household purposes. *See* Cal. Civ. Code § 1788.2(e) and 1788.2(f).

42.    This case involves money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction. As such, this action arises out of a "consumer debt" and "consumer credit" as those terms are defined by California Civil Code § 1788.2(f).

## FACTUAL ALLEGATIONS

43.    Plaintiff is a 57-year-old woman suffering from multiple sclerosis.

44.    After working almost her entire life from the age of 10—babysitting, cleaning houses, and mowing lawns—Plaintiff last held a job at the United States Postal Service where she enjoyed a 33-year tenure.

45.    Plaintiff was diagnosed with MS in 2002 but continued to fight through the pain and worked for an additional 15 years while her symptoms grew more severe.

46.    Due to the increasing severity of her ailment, Plaintiff was forced to retire in 2017 and can no longer work. She is on permanent disability and receives a fixed income.

47.    Plaintiff's disability qualified her for Social Security Disability Income ("SSDI"), and her SSDI combined with her U.S. Postal Service pension provides her with $3,830 per month after taxes.

48.    Plaintiff's husband is unemployed and acts as her primary caregiver. As such, he does not earn an income and the $3,830 per month must provide food, medicine, and household payments for both Plaintiff and her husband.

49.    Plaintiff owns and lives in a modest, single-family home in Oakley, California.

### First Incident and Loan involving Defendants
### Builders and PFG

50.    In or around March 2018, Plaintiff applied and qualified for assistance through the California Alternative Rates for Energy ("CARE") program due to her permanent disability and resulting financial need.

///

51.    After qualifying for the reduced rates, Plaintiff sought to further reduce her energy bill by searching on her energy provider's, PG&E, website to find energy efficient programs, which PG&E advertised.

52.    After looking through her options, Plaintiff began receiving phone calls in relation to her searches for energy efficient alternatives. Believing she was being contacted by PG&E representatives, she agreed to have her home assessed for potential improvements.

53.    Plaintiff and her husband were approached by a representative of Builders named Shawn Hunt, who offered a plan to install new "energy efficient landscaping," insisting the proposed work would make Plaintiff's yard "drought-resistant" and would save her money on energy bills in the long run. Shawn also represented that the proposed work would increase the value of her home.

54.    Shawn used high pressure sales tactics: meeting with Plaintiff and her husband directly in their home, telling Plaintiff her home "needed" the proposed landscaping work, failing to explicitly disclose material terms of the contract—including the financing terms—in order to induce Plaintiff and her husband to sign the same day without considering any potential downside.

55.    Also, in direct contravention to what Shawn expressly promised to Plaintiff, the contract itself contained an express disclaimer stating: "seller makes no guareantee (sic) or promise concerning reduction on energy bills as a result of any work performed." This disclaimer of an express warranty is unconscionable, as the entire value of the service was to reduce energy costs.

56.    Plaintiff indicated her belief during the conversation with Shawn that the proposed work was sponsored and would be funded by PG&E, and Shawn said nothing to indicate PFG would be funding the project and that ultimately she would be liable to pay PFG through tax assessments.

57.    Shawn presented Plaintiff and her husband with a tablet computer including the contract provisions, and he pressured them to sign quickly by falsely

- 9 -

stating that Plaintiff's and her husband's signatures were needed immediately to qualify for funding.

58.     At the time, Plaintiff was not aware of California's PACE financing program nor was she aware of Defendant PFG's involvement in the arrangement with Builders.

59.     Soon after signing the electronic version of the contract, Builders proceeded to work on Plaintiff's landscaping as agreed.

60.     Builders finished the work on Plaintiffs property later in 2018.

61.     It was not until much later, in July 2019, when Plaintiff received a shocking bill reflecting an increase on her property tax liability attributed to PFG that she realized the services rendered by Builders were being charged to her via a tax assessment.

62.     Plaintiff was severely distressed by the increased bill, as she and her husband had been looking for ways to ration what little income they had, not to be stuck with an annual assessment which would span 25 years and give the payee a priority lien on their home.

63.     In fact, in the brief meeting with Shawn in 2018, Plaintiff had been induced to unwittingly sign a financing agreement relating to the landscaping services where each year for twenty-five years an assessment of $5,994.80 would be added to her tax bill.

64.     The agreement purported to charge $56,855 in principal for the landscaping services; however, the payments were subject to an annual 8.19% interest rate with the final total of all payments estimated at $149,870.

65.     There was also a second contract signed the same day for "removing grass and hauling away debris" at a cost of $45,000, also to be funded by PFG's assessments.

///

///

66.    The price of both contracts totaled $101,855 and would balloon to a much higher price over the 25-year term of the assessment period due to the excessive interest rates PFG charged.

67.    The assessment would not be fully paid off until Plaintiff was 82 years old under this payment plan, and Defendant PFG's priority lien would remain on Plaintiff's house until the assessments were all paid.

68.    Further, the disclosures in the contract explicitly acknowledge it is the policy of both Fannie Mae and Freddie Mac, both well-established residential mortgage purchasing institutions, to not purchase mortgages of any single-family homes with PACE assessments attached to the property. The reason being these "assessments" were de facto loans which encumbered the property and made them far less marketable.

69.    The reality of the situation contravened what Shawn had told Plaintiff; the project agreed to was costly and diminished the value of her home since it would be less marketable with Defendant PFG's priority lien attached.

70.    By the time Plaintiff realized what happened, it was too late to cancel the contract, her attempts to rescind the contract were ignored by Defendant.

71.    Builders misrepresented the actual costs of the proposed landscaping project, failed to explain how the assessments worked, and did not disclose that Defendant PFG would receive a priority lien on Plaintiff's home.

72.    By making material omissions and false promises which induced Plaintiff to rely on Defendant's word, Defendant PFG violated TILA. 15 U.S.C. § 1601 et seq.

### Second Incident and Loan Involving
### Defendant Renew/Holdings

73.    Also at or around March 2018, Plaintiff was visited by a different entity: Fidelity Home Energy, LLC ("Fidelity"), which Plaintiff also believed was associated with PG&E.

74.     Fidelity was actually enacting its own PACE scam, and Fidelity sent a representative named Brian McConnell to Plaintiff's home to discuss "energy saving modifications."

75.     Brian proposed installation of "green" windows which he claimed would decrease Plaintiff's energy costs and increase the value of her home.

76.     Similar to the contract entered into with Builders, Brian did not disclose material terms of the financing arrangement.

77.     Brian also pressured Plaintiff into calling Renew/Holdings the same day he visited her home in order to determine whether she qualified for "grant funding."

78.     In reality, this project was to be funded by tax assessments and the granting of a priority lien to Renew/Holdings.

79.     Brian also presented Plaintiff and her husband with a tablet computer and encouraged them to sign the same day he proposed his project.

80.     Though the stated price of the project was much lower, the capitalized interest on the annual assessments increased the ultimate "financed" price of the new windows to $16,337.70, to be paid at an amount of $1,700.1 per year for 20 years. The national average for window installation in a residential home was $5,174 in 2019, the year after the installation.

81.     Similar to the contract entered into with Builders, Plaintiff genuinely believed the project was funded by PG&E, and Brian did nothing to correct Plaintiff's mistaken belief.

82.     Strikingly, Brian was not licensed with the California Contractors State License Board at the time Fidelity conferred services on Plaintiff's home. Fidelity in fact is no longer an active corporation, as the entity dissolved in 2019.

83.     Plaintiff was shocked in July 2019 to see an assessment attributed to Renew/Holdings which increased her tax liability greatly.

84.     Plaintiff is threatened with the nearing risk that her home will be foreclosed on by PFG or Renew/Holdings, and she will be homeless.

85.    Plaintiff is severely distressed and fears that her lifetime of hard work will be for naught in the event she is unable to pay her tax assessments and PFG or Renew/Holdings are able to foreclose on her home.

86.    Defendants' financing practices are fraudulent and unfair because the practices bait consumers into believing their clean-energy home improvements are somehow financed by the government or by PG&E, induce them into signing the contract presented solely on a tablet computer, and switch this purported financing deal to very expensive and burdensome obligations, the consequences of which are unexplained to consumers, and non-payment of which will lead to foreclosure of a home.

87.    These practices are further fraudulent and unfair because Defendants promise to deliver "high-efficiency" products and services which will save money to the customers, when really the massive expenses are not worth the benefits received, if any.

88.    Defendants fraudulently acquired a property interest from disabled, elderly individuals by misrepresenting the total cost of home improvements and failing to provide requisite disclosures regarding the priority lien term of the financial arrangement.

89.    Upon information and belief throughout 2018, Defendants have originated hundreds of PACE funding loans that cost more than $20,000 for similarly vulnerable individuals throughout California. Despite the additions to California's Streets and Highway Code; Clean Energy Assessment Contracts prohibiting this conduct, Defendants have continued their unlawful practice in 2019.

90.    Further, upon information and belief, PFG and Renew/Holdings extended credit to consumers under high rate mortgages, as defined by 15 U.S.C. § 1602(aa), based on the consumers' collateral without regard to the consumers' repayment ability, including their current and expected income, current obligations and employment, in violation of 15 U.S.C. § 1639(h).

**FIRST CAUSE OF ACTION**

**VIOLATIONS OF THE TRUTH IN LENDING ACT**

**15 U.S.C. § 1601 et seq.**

**(Against Defendants PFG and Renew/Holdings Only)**

Statutory Summary

91.     The Truth in Lending Act (TILA) at 15 U.S.C. § 1601 et seq. imposes a series of disclosure requirements on lenders that extend credit to consumers and take a security interest in the consumer's principal residence. The disclosures required under TILA include various terms and costs of the loan, a good faith estimate of finance costs and notice of the right of rescission. Among other things, TILA's purpose is to "assure meaningful disclosure of credit terms and to provide a borrower with the right to rescind a loan for the failure to do so." 15 U.S.C. § 1601(a). TILA at 15 U.S.C. §§ 1635 through 1640 provides the consumer with the right to money damages or to rescind "a loan transaction in which a security interest is or will be retained or acquired in the borrower's principal residence." The United States Supreme Court held a borrower's right to rescind a loan transaction for failure to comply with TILA is accomplished by providing notice to the lender of the intent to rescind, given within three years of the date the loan was consummated. *Jesinoski v. Countrywide Home Loans*, 135 S. Ct. 790 (2015). This lawsuit arises in part from the failure of the Defendants, and each of them, to comply with TILA.

92.     Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

93.     Credit is defined as the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment. 15 U.S.C. § 1602(f).

94.     A "consumer" used with reference to a credit transaction, characterizes the transaction as one in which the party to whom the credit is offered or extended is a natural person, and the money, property, or services which are the subject of the

transaction are primarily for personal, family, or household purposes. 15 U.S.C. § 1602(i).

95.    Under TILA, interest charges constitute "finance charge[s]." 15 U.S.C. § 1605(a).

96.    As a business that finances clean-energy or energy-efficient home improvements in exchange for tax assessment payments, PFG and Renew/Holdings regularly extend credit to consumers, who assign those funds to a contractor in exchange for performance of "home improvement" work. PFG's and Renew/Holdings' PACE funding, as with any other traditional loan, assess finance charges and other fees on top of the principal advanced to the consumer.

97.    The only difference between PFG's and Renew/Holdings' loans and a traditional loan backed by a security interest in the borrower's home is the debtor in PFG's and Renew/Holdings' case pays the loan back through a special tax assessment as opposed to monthly payments.

98.    PFG's and Renew/Holdings' loans also offer substantially higher interest rates than traditional home equity loans.[4]

99.    PFG and Renew/Holdings are the parties to whom the debt arising from the consumer credit transaction is initially payable. Therefore, Defendants PFG and Renew/Holdings are "creditors" as defined under TILA.

100.    A "creditor" also means any person who originates two or more high-cost mortgages in any 12-month period. 15 U.S.C. § 1602(g).

101.    "High-cost mortgage" means a loan of less than $20,000 which is secured by the consumer's dwelling and for which the total points and fees exceed the lesser of $1,000 or 8% of the total loan amount. 15 U.S.C § 1602(bb)(1)(A)(ii).

///

---

[4] For reference, as of May 10, 2019, San Diego County Credit Union charges between 5.875% and 6.250% for a home equity loan comparative to the first loan Plaintiff received from PFG at 8.19% interest.

102.   Plaintiff's debt is a high-cost mortgage transaction because the points and fees associated with Plaintiff's debt exceed $1,000.

103.   Upon information and belief throughout 2018, Defendants have originated hundreds of PACE funding loans that cost more than $20,000 from vulnerable individuals throughout California. Defendants have continued this practice in 2019 and 2020.

104.   A "mortgage originator" is any person who, for direct or indirect compensation, (i) takes a residential mortgage loan application; (ii) assists a consumer in obtaining or applying to obtain a residential mortgage loan; or (iii) offers or negotiate terms of a residential mortgage loan. 15 U.S.C. § 1602(dd)(2).

105.   Under TILA, creditors are prohibited from making a residential mortgage loan unless the creditor makes a reasonable good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan according to its terms. 15 U.S.C. 1639c(a)(1).

106.   The term "residential mortgage loan" means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling.

107.   Plaintiff's debts for the installation of energy efficient windows, and drought resistant landscaping are residential mortgage loans because the debts were secured by a tax lien on the dwelling or on residential real property that includes a dwelling. Further, although Plaintiff's PACE financing is paid under the guise of a "tax assessment," the ensuing debts still work like a mortgage on a home, except it provides PFG and Renew/Holdings priority over other creditors.

108.   A consumer's ability to repay a residential mortgage loan must include consideration of the consumer's credit history, current income, expected income, current obligations, debt-to-income ratio, employment status, and other financial

resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan. 15 U.S.C. 1639c(a)(3)

109.   A creditor making a residential mortgage loan must verify amounts of income or assets that a creditor relies on to determine repayment ability, including expected income or assets, by reviewing the consumer's W-2 form, tax returns, payroll receipts, financial institution records or other documents that provide reasonably reliable evidence of the consumer's income or assets.

110.   Neither PFG nor Renew/Holdings considered Plaintiff's credit history, income, employment, or debt-to-income ratio in deciding whether to approve the PACE financing. In fact, Renew/Holdings advertises that "no FICO check" is needed to qualify for its funding.[5] PFG insists that "approval [for funding] is not based on your credit score."[6] Instead, Defendants relied solely on the value of Plaintiff's property to approve the PACE financing, knowing full well that PFG's and Renew/Holdings' priority liens would cover their investment in the case of Plaintiff's default or, worse, her untimely death.

111.   PFG and Renew/Holdings made residential mortgage loans to Plaintiff without making a reasonable, good faith determination of her ability to pay. Consequently, Defendants violated both TILA, 15 U.S.C. § 1639c(a)(1), and TILA's implementing regulation, Regulation Z, 12 C.F.R § 226.34(a)(4).

112.   TILA prohibits "mortgage originators from steering any consumer to a residential mortgage loan that the consumer lacks a reasonable ability to repay; or has predatory characteristics or effects." 15 U.S.C. § 1639b(c)(3)(A)(i-ii).

113.   Defendants PFG and Renew/Holdings are mortgage originators because they received direct compensation for accepting a residential mortgage loan

---

[5] https://renewfinancial.com/learn-about-home-improvement-financing-pace (Last visited 06/11/20).

[6] https://www.pacefunding.com/homeowner/ (Last visited 06/11/20).

application; assisted a consumer in obtaining a residential mortgage loan; and offered the terms of a residential mortgage loan.

114.   Plaintiff lacks the reasonable ability to repay PFG's financing loan of around $6,000 annually.

115.   Plaintiff lacks the reasonable ability to repay Renew/Holdings' financing loan of around $1,700 annually.

116.   Further, PFG's and Renew/Holdings' PACE financing program has predatory characteristics. Defendants specifically solicited PACE financing home improvements to Plaintiff, a disabled woman because she owns substantial equity in her home. Therefore, PFG and Renew/Holdings violated 15 U.S.C. § 1639b(c)(3).

117.   As a result of Defendants' multiple violations of TILA, Plaintiff is entitled to the sum of actual damages, statutory damages under 15 U.S.C. § 1640, costs of this action, and reasonable attorneys' fees. Plaintiff also reserves his right to rescind the contract pursuant to 15 U.S.C. § 1635(f).

118.   Due to Defendants PFG's and Renew/Holdings' tactics of covering up the true nature of the agreements, Plaintiff did not discover the TILA violations until July 2019. The statute of limitations should be subject to equitable tolling and Plaintiff's complaint therefore is filed timely.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE HOME OWNERSHIP EQUITY PROTECTION ACT, 15 U.S.C. § 1639

### (Against Defendants PFG and Renew/Holdings Only)

119.   Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

120.   As mentioned above, PFG and Renew/Holdings are "creditors" under 15 U.S.C. § 1602, which also applies to HOEPA provisions.

121.   The HOEPA requires for each creditor to provide the following disclosures in conspicuous type size:

- "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application."
- "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan." 15 U.S.C. § 1639(a)(1).

122. PFG and Renew/Holdings failed to provide the requisite HOEPA disclosures to Plaintiff when PFG and Renew/Holdings executed the PACE financing agreement. Therefore, PFG and Renew/Holdings violated 15 U.S.C. § 1639(a)(1).

123. Indeed, Plaintiff was shown the agreement on a tablet computer and not given any time to review at the time of original contracting, and Plaintiff did not receive the PACE financing agreements until more than one year after the services.

124. Under HOEPA, creditors shall not engage in a pattern or practice of extending credit to consumers under mortgages based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment. 15 U.S.C. § 1639(h).

125. Neither PFG nor Renew/Holdings considered Plaintiff's income, credit history, employment, and other financial resources when they decided to provide PACE financing to Plaintiff. Instead, PFG and Renew/Holdings based their decisions solely on the value of Plaintiff's property. Therefore, PFG and Renew/Holdings violated 15 U.S.C. § 1639(h).

126. HOEPA also prohibits creditors from paying a contractor under a home improvement contract from amounts extended as credit under a high-cost mortgage other than in the form of an instrument payable to the consumer and the contractor. 15 U.S.C. § 1639(i); 12 C.F.R. 1026.34(a)(1).

127. Plaintiff acquired PACE financing from PFG and Renew/Holdings, for home improvement loans. PFG and Renew/Holdings then paid their respective contractors directly. Therefore, PFG and Renew/Holdings violated 15 U.S.C. § 1639(i) (HOEPA) and 12 C.F.R. 1026.34(a)(1) (Regulation Z).

128.   HOEPA prohibits creditors from extending mortgages without first receiving a certification from a counselor that is approved by the Secretary of Housing and Urban Development or a State housing finance authority that the consumer has received counseling on the advisability of the mortgage. 15 U.S.C. § 1639(u).

129.   Neither PFG nor Renew/Holdings confirmed whether Plaintiff received the requisite counseling under 15 U.S.C. § 1639(u). In fact, Plaintiff never received such counseling. By extending a mortgage to Plaintiff without confirming whether they received counseling, both PFG and Renew/Holdings violated 15 U.S.C. § 1639(u).

130.   As a result of each and every violation of HOEPA, 15 U.S.C. § 1639, Plaintiff is entitled to the sum of actual damages, statutory damages under 15 U.S.C. § 1640, costs of this action, and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT

### Cal. Civ. Code §§ 1788-1788.32

### (Against Defendants PFG and Renew/Holdings Only)

131.   Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

132.   Rosenthal incorporates specific provisions of its federal counterpart, the Fair Debt Collection Practices Act ("FDCPA"). Cal. Civ. Code § 1788.17. Specifically, Rosenthal incorporates 15 U.S.C. § 1692f, which prohibits a debt collector's use of unfair or unconscionable means to collect or attempt to collect a debt of any amount, "unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

133.   Both PFG and Renew/Holdings are attempting to collect nearly twice the amount of Plaintiffs' alleged debt, wherein the consequences of not paying result in Plaintiffs' home being foreclosed.

134. Here, PFG advanced $62,495.44, and Renew/Holdings advanced $16,337.7 to Plaintiff. The county's intermediary collection of payments for PFG does not absolve PFG's liability for violations of the Rosenthal Act.

135. Additionally, in the event of a judicial foreclosure, Plaintiff is personally liable for a deficiency judgment.

136. PFG's and Renew/Holdings' conduct was unfair and unconscionable, and therefore violated 15 U.S.C. § 1692e(2), which is incorporated through Cal. Civ. Code § 1788.17.

137. As a result of PFG's and Renew/Holdings' violations of the Rosenthal Act, Plaintiff is entitled to any actual damages pursuant to Cal. Civ Code § 1788.30(a); statutory damages in the amount up to $1,000 pursuant to Cal. Civ Code § 1788.30(b); and reasonable attorneys' fees and costs pursuant to Cal. Civ Code § 1788.30(c) from PFG and Renew/Holdings.

138. Due to PFG's and Renew/Holdings' tactics of covering up the true nature of the agreements, Plaintiff did not realize she had any debt obligations until July 2019. The statute of limitations should be subject to equitable tolling, and therefore this Complaint is filed timely.

## FOURTH CAUSE OF ACTION

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT

### Cal. Civ. Code §§ 1750 et seq.

139. Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

140. California Civil Code section 1750 et seq., titled the CLRA, provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code section in 1760, which provides, *inter alia*, that its terms are to be:

///

"Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

141. Under the CLRA, Plaintiff is a "consumer" who acquired services for personal, family or household purposes. Cal. Civ. Code § 1761(d).

142. Plaintiff suffers from Multiple Sclerosis and is "disabled" as defined in the CLRA. Cal. Civ. Code § 1761(f).

143. The home improvement projects that Plaintiff acquired from Defendants is a "service" within the meaning of Cal. Civ. Code § 1761(a).

144. PFG and Renew/Holdings choose what products qualify for financing, purportedly ensure the products are installed in consumers' homes, and developed a platform from which consumers can attain contracting work. All of these "services" were furnished in connection with the sale of the windows and landscaping services to Plaintiff.

145. Upon information and belief, PFG's and Renew/Holdings' entire sales force are door-to-door contractors, such as Builders and Fidelity.

146. Builders, in association with PFG, provided Plaintiff's landscaping alterations as a "service."

147. The CLRA prohibits "misrepresenting the source, sponsorship, approval, or certification of goods or services" and "misrepresenting the affiliation, connection, or association with, or certification by, another." Cal. Civ Code § 1770(a)(2) – (3).

148. Defendants conned Plaintiff into accepting overly priced and wholly unnecessary goods and services by representing PG&E was connected with the program and would be assisting in the funding of Plaintiff's "energy efficient" home improvements. This was not true.

149. Defendants engaged in a myriad of lies and material omissions in an effort to procure Plaintiff's business.

///

- 22 -

KAZEROUNI
LAW GROUP, APC

150.   The CLRA also prohibits "misrepresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation or connection in which he or she does not have." Cal. Civ. Code § 1770(a)(5).

151.   Defendants violated the CLRA because they misrepresented the quality and benefits Plaintiff would receive from the home improvement services. Plaintiff has not saved money, but instead has become indebted for the rest of her life for home improvements she did not need and could not afford.

152.   Defendants also represented to Plaintiff that they provide these services under a "government program." This misrepresented to Plaintiff that the goods/services provided, process of obtaining financing, source of payment, and/or other particulars of the contract would be provided for or, at the very least, were regulated by the government.

153.   This, however, is not the case, as the only thing the "government program" provides is a special tax assessment district by which predatory lenders such as Defendants believe they can skirt consumer protection laws and obtain super priority liens on unsuspecting disabled persons' homes. Consequently, Defendants violated Cal. Civ. Code § 1770(a)(2) and (a)(3).

154.   The CLRA prohibits "representing that a part, replacement, or repair service is needed when it is not." Cal. Civ. Code § 1779(a)(15).

155.   Builders and Fidelity represented to Plaintiff that she needed to extensive home improvements to become more energy efficient. There is no evidence that the work done made Plaintiff's home more energy efficient. Further, Builders did not make any assessment of the energy efficiency of Plaintiff's home at the time it made such representations. Consequently, Defendants violated Cal. Civ. Code § 1770(a)(15).

156.   Plaintiff is not a sophisticated expert about PACE funding programs or energy-efficient home improvements, and she acted reasonably when she "agreed" to

- 23 -

Defendants' services based on Plaintiff's beliefs that Defendants' representations were true and lawful.

157.   Defendants manipulated Plaintiff into procuring unnecessary and unaffordable services, so that PFG and Renew/Holdings could gain priority liens over Plaintiffs' property and Builders and Fidelity could receive exorbitant amounts.

158.   Defendants therefore violated the CLRA.

## FIFTH CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW,

### Business and Professions Code § 17200 et seq.

159.   Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

160.   Plaintiff and Defendants are each "person[s]" as defined by California Business & Professions Code § 17201.  California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

161.   "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," three of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, and (3) a "fraudulent" business act or practice.  The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

162.   Defendants acted in concert in an effort to extort exorbitant amounts from disabled and elderly individuals, while providing themselves security in their income stream in the form of a priority lien on these vulnerable individuals' homes. Therefore, Defendants' conduct constitutes "unfair competition" as defined in California Business and Professions Code Section § 17200 et seq.

///

///

*A. "Unlawful" Prong*

163.   Defendants violated TILA, HOEPA, and the CLRA in addition to committing fraud. These extensive and substantial statutory and common law violations evidence Defendants' unlawfulness within the meaning of the UCL.

164.   Defendants had other reasonably available alternatives to further their business interests, other than the unlawful conduct described herein, such as falsely representing the performance of services.

165.   Instead Defendants deliberately extended credit to Plaintiff without confirming whether Plaintiff could repay the loans.

166.   Plaintiff reserves the right to allege other violations of law, which constitute additional unlawful business practices or acts, as such conduct is ongoing and continues to this date.

*B. "Unfair" Prong*

167.   Defendants' actions and representations constitute an "unfair" business act or practice under Business & Professions Code § 17200 et seq. in that Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.  Without limitation, it is an unfair business act or practice for Defendants to knowingly or negligently represent to the consuming public that they offer quality products funded by PG&E and force consumers to become indebted for the remainder of their lives or lose their homes to pay off minor home improvements.

168.   Such conduct by Defendants is "unfair" because it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers in that consumers are led to believe that Defendants are providing a benefit to consumers. Instead, Defendants manipulate consumers into disregarding their rights and attaching property liens on elderly, disabled peoples' homes.

- 25 -

169.   Plaintiff could not have reasonably avoided the injuries she suffered. Indeed, until she received her taxes the years following the services, Plaintiff was not aware of Defendants' ongoing and exploitative conduct. Plaintiff reserves the right to allege further conduct that constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date, as Defendants continue to mislead the public and combined attach over $7,000 in annual charges to Plaintiff.

### C. "Fraudulent" Prong

170.   Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

171.   Defendants' fraudulent, unlawful and unfair business practices, as described above, presents an ongoing threat to consumers because consumers will continue to be misled by the services Defendants offer on their websites and through door-to-door solicitations.

172.   Defendants engaged in fraudulent and deceptive business practices that mislead the public. They deliberately deceived Plaintiff by representing that Defendants were affiliated with the PG&E and/or PG&E would pay for the services, promising high efficiency home improvements and in turn providing the lowest efficiency products legally permitted, presenting limited time to review documentation to Plaintiff, and overcharging interest payments.

173.   Plaintiff has suffered injury in fact, has lost money and continues to lose money, and risks having her home being foreclosed as a result of Defendants' unfair competition, as more fully set forth herein. Plaintiff has been injured as she relied on Defendants' misrepresentations.

174.   Defendants, through their acts of unfair competition, have unfairly acquired a priority secured interest in Plaintiff's home. Plaintiff requests this Court rescind the parties' contract, and remove the lien on Plaintiff's home, for Defendants'

violations of the California Business & Professions Code § 17200 et seq., as discussed herein.

175.   Plaintiff further seeks an order requiring Defendants to make full restitution of all monies wrongfully obtained and disgorge all ill-gotten revenues and/or profits, together with interest thereupon.

## SIXTH CAUSE OF ACTION

### FRAUD

176.   Plaintiffs repeat, re-allege, and incorporate by reference, all allegations of this Complaint as though fully stated herein.

177.    In California, fraud exists when there is (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud or induce reliance; (d) justifiable reliance; and (e) resulting damage. *Engalla v. Permanente Medical Group*, 15 Cal.4th 951, 974 (1997).

178.   Defendants worked together to take advantage of Plaintiff. Defendants came in person to Plaintiff's home, misrepresented to Plaintiff that she needed energy efficient home improvements when she did not and that PG&E would pay for all of the costs of the home improvements through a grant when it would not.

179.   Defendants worked together to defraud Plaintiff. Builders and Fidelity used misrepresentations and concealments to coerce Plaintiff into an agreement, and PFG and Renew/Holdings compounded the fraud by obtaining a priority lien on Plaintiff's property and assessments that she is incapable of paying.

180.   Plaintiff relied on Defendants' representations that PG&E would pay for all of the costs of the home improvements, that Plaintiff would ultimately save money, and the remodeling was necessary for energy efficiency. As a result, Plaintiff has and continues to lose money, and her ability to sell her house has been hindered as there is a priority tax lien attached to the property. Plaintiff now suffers emotional distress.

181.   Plaintiff is entitled to compensatory damages, restitutionary relief, and punitive damages.

### SEVENTH CAUSE OF ACTION

### FINANCIAL ABUSE OF A DEPENDENT ADULT

### Cal. Welfare & Institutions Code § 15610 et seq.

182.   Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

183.   "Dependent adult" means a person, regardless of whether the person lives independently, between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age. WIC § 15610.23

184.   Plaintiff is fifty-seven years old and considered a "dependent adult" under California Welfare and Institutions Code § 15610.23 and is therefore entitled to statutory protections from abuse provided by California Welfare and Institutions Code § 15610.07.

185.   A person or entity engages in "financial abuse" of a dependent adult when this person or entity "takes, secretes, appropriates, obtains, or retains real or property of an elder . . . with intent to defraud . . . ." Cal. Welf. & Inst. Code § 15610.30(a). "A person or entity shall be deemed to have taken, appropriated, obtained, or retained property for wrongful use if . . . the person or entity knew or should have known that this conduct is likely to be harmful to the elder." Cal. Welf. Inst. Code § 1561030(b).

186.   Further, a person or entity takes, secretes, appropriates, obtains or retains real property when a dependent adult is deprived of any property right, including by means of an agreement.

187.   As alleged herein and throughout, Defendants PFG and Renew/Holdings wrongfully and coercively caused Plaintiff to agree to give PFG and Renew/Holdings a priority lien on her home, constituting a "taking" of a property interest under Cal.

WIC § 15610.30(a).

188.   Defendants PFG and Renew/Holdings are responsible for financial abuse because their treatment of Plaintiff resulted in her mental suffering under Cal. WIC § 15610.07(a). Plaintiff is constantly severely distressed by the notion that either PFG or Renew/Holdings could foreclose on her home if her fixed income is insufficient to cover the tax assessments on her property. *Zimmer v. Nawabi*, 566 F. Supp. 2d 1025, 1034 (E.D. Cal. 2008) (granting plaintiff's motion for summary judgment on the issue alleging that misrepresenting the actual terms of a mortgage loan was "financial elder abuse" under Cal WIC § 15610.30(a)(1)-(2)).

189.   As a result of Defendants' conduct, Plaintiff has suffered general and economic damages. Further, Plaintiff has incurred attorneys' fees and costs of this action.

190.   Plaintiff is also entitled to exemplary or punitive damages under Cal. WIC § 15657.5, because Defendants acted with recklessness, oppression, fraud, and malice.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants, and Plaintiff be awarded damages from Defendants, as follows:

### **FIRST CAUSE OF ACTION**

### **VIOLATIONS OF THE TRUTH IN LENDING ACT**

### **15 U.S.C. § 1601 et seq.**

### **(Against Defendant PFG and Renew/Holdings)**

- An award for actual damages pursuant to 15 U.S.C. § 1640(a)(1);
- An award for an amount equal to the sum of all finance charges and fees paid by Plaintiff pursuant to 15 U.S.C. § 1640(a)(4);
- An award for attorneys' fees and costs pursuant to 15 U.S.C. § 1640(a)(3);
- Treble damages pursuant to Cal. Civ. Code § 3345; and
- Any other relief this Court should deem just and proper.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE HOMEOWNERSHIP EQUITY**

**15 U.S.C. § 1639 et seq.**

**(Against Defendants PFG and Renew/Holdings)**

- An award for actual damages pursuant to 15 U.S.C. § 1640(a)(1);
- An award for attorneys' fees and costs pursuant to 15 U.S.C. § 1640(a)(3);
- Treble damages pursuant to Cal. Civ. Code § 3345; and
- Any other relief this Court should deem just and proper.

**THIRD CAUSE OF ACTION**

**ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT**

**Cal. Civ. Code §§ 1788-1788.32**

**(Against Defendants PFG and Renew/Holdings)**

- An award of actual damages pursuant to California Civil Code § 1788.30(a);
- An award of statutory damages of $1,000 pursuant to Cal. Civ. Code § 1788.30(b);
- An award of costs of litigation and reasonable attorneys' fees, pursuant to Cal. Civ. Code § 1788.30(c);
- Treble damages pursuant to Cal. Civ. Code § 3345; and
- Any other relief this Court should deem just and proper.

**FOURTH CAUSE OF ACTION**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**

**Cal. Civ. Code § 1750 et seq.**

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a)[7];

///

---

[7] Pursuant to Cal. Civ. Code § 1782, Plaintiff sent a CLRA letter requesting that Defendants cure their conduct. Defendants were given the requisite period to cure under the CLRA but have failed to do so.

1  • An award of costs and attorneys' fees pursuant to Cal. Civ. Code § 1780(e);
2     and

3  • Any and all relief that this Court deems necessary or appropriate.

4  **FIFTH CAUSE OF ACTION**

5  **CALIFORNIA'S UNFAIR COMPETITION LAW**

6  **Business and Professions Code § 17200 et seq.**

7  • An award for restitutionary relief in the form of disgorgement of profits
8     under Cal. Bus. and Prof. Code § 17203 ("any money. . . which may have
9     been acquired by means of such unfair competition");

10  • Exemplary and/or punitive damages for intentional misrepresentations
11     pursuant to, *inter alia*, Cal. Civ. Code § 3294;

12  • Injunctive relief under Cal. Bus. and Prof. Code § 17203; and

13  • Any other relief this Court should deem just and proper.

14  **SIXTH CAUSE OF ACTION**

15  **FRAUD**

16  • An award of actual damages, statutory damages, punitive, or treble
17     damages, and other proper relief as provided by law;

18  • Equitable relief in the form of an injunction prohibiting the Defendants'
19     conduct described herein;

20  • The costs of bringing this suit, including reasonable attorneys' fees;

21  • Treble damages pursuant to Cal. Civ. Code § 3345; and

22  • Any other relief this Court should deem just and proper.

23  **SEVENTH CAUSE OF ACTION**

24  **FINANCIAL ABUSE OF A DEPENDENT ADULT**

25  **Cal. Welf. & Inst. Code § 15610 et seq.**

26  • An award for compensatory damages pursuant to Cal. Welf. & Inst.
27     Code § 15657.5(a) awarded based on Plaintiff's financial abuse of a

28

FIRST AMENDED COMPLAINT

dependent adult claim under Cal. Welf. & Inst. Code § 15610.30, in an amount to be determined by the Court;

- An amount for punitive damages under Cal. Welf. & Inst. Code § 15657.5(a) and Cal. Civ. Code § 3294, and treble damages pursuant to Cal. Civ. Code § 3345;

- An amount for reasonable attorneys' fees pursuant to Cal. Welf. & Inst. Code § 15657.5(a);

- An amount for costs of suit pursuant to Cal. Code Civ. P. § 1033 et seq.; and Cal. Welf. & Inst. Code § 15657.5(a); and

- Any other relief this Court deemed just and proper.

## **TRIAL BY JURY**

191.   Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.


Dated: September 16, 2020

KAZEROUNI LAW GROUP, APC


By _____/s/ Yana A. Hart_____

YANA A. HART
yana@kazlg.com

Attorney for Plaintiff
DEBORAH PEREZ

- 32 -

FIRST AMENDED COMPLAINT